FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

NOV 3 0 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.** 1:09-CV-3347 |
| ) | |
| **ECONOMIC RELIEF** ) | **COMPLAINT FOR** |
| **TECHNOLOGIES, LLC,** ) | **PERMANENT** |
| a Nevada limited liability company, ) | **INJUNCTION AND OTHER** |
| ) | **EQUITABLE RELIEF** |
| **SAFERIDE WARRANTY LLC,** ) | |
| a Florida limited liability company, ) | |
| ) | |
| **VP MARKETING, LLC,** ) | |
| a Georgia limited liability company, ) | |
| ) | |
| **JASON JAMES EYER,** ) | |
| ) | |
| **KARA SINGLETON ADAMS, and** ) | |
| ) | |
| **JAMES A. SHOENHOLZ,** ) | |
| ) | |
| **Defendants.** ) | |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.    The FTC brings this action under Sections 13(b) and 19 of the Federal

Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the

Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing

Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent

injunctive relief, rescission or reformation of contracts, restitution, the refund of

EXHIBIT A

monies paid, disgorgement of ill-gotten monies, and other equitable relief for

Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C.

§ 45(a), and in violation of the FTC's Telemarketing Sales Rule ("TSR"), 16

C.F.R. Part 310.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b,

6102(c), and 6105(b).

3.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (c), and

15 U.S.C. § 53(b).

## PLAINTIFF

4.    The FTC is an independent agency of the United States Government

created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or

affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C.

§§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and

enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive

telemarketing acts or practices.

2

5.    The FTC is authorized to initiate federal district court proceedings, by
its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure
such equitable relief as may be appropriate in each case, including rescission or
reformation of contracts, restitution, the refund of monies paid, and the
disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), 57b,
6102 (c), and 6105(b).

## DEFENDANTS

6.    Defendant Economic Relief Technologies, LLC ("ERT") is a Nevada
limited liability company with a last known address of 1820 Water Place, Suite
250, Atlanta, Georgia 30339.  ERT transacts or has transacted business in this
District and throughout the United States.

7.    Defendant SafeRide Warranty LLC ("SafeRide") is a Florida limited
liability company, that was domesticated in Georgia on May 8, 2008, with its last
known principal place of business at 1820 Water Place, Suite 255, Atlanta, Georgia
30339.  SafeRide transacts or has transacted business in this District and
throughout the United States.

8.    Defendant VP Marketing, LLC ("VPM") was a Georgia limited
liability company with its principal place of business at 1820 Water Place, Suite

3

195, Atlanta, Georgia 30339. VPM transacts or has transacted business in this District and throughout the United States.

9.    Defendant Jason James Eyer ("Eyer") is a member manager of ERT and SafeRide, and was a member of VPM. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of ERT, SafeRide, and VPM, including the acts and practices set forth in this Complaint. Defendant Eyer resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

10.    Defendant Kara Singleton Adams ("Adams") is a member manager of ERT and SafeRide, and was a member manager of VPM. At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of ERT, SafeRide, and VPM, including the acts and practices set forth in this Complaint. Defendant Adams resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

11.    Defendant James A. Schoenholz ("Schoenholz") is a member

and Corporate Secretary of ERT and SafeRide, and was a member manager of VPM. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of ERT, SafeRide, and VPM, including the acts and practices set forth in this Complaint. Defendant Schoenholz resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

12.    Defendants ERT, SafeRide, and VPM (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the unlawful acts and practices alleged below. The Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, office locations, and have commingled funds. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Individual Defendants Eyer, Adams, and Schoenholz have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

13.   At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

14.   Since at least January of 2008, Defendants have engaged in deceptive and abusive telemarketing campaigns involving purported credit card interest rate reduction services and automobile warranties.

15.   In the course of conducting their campaigns, Defendants, either directly or through one or more intermediaries, have initiated telephone calls to consumers throughout the United States to induce the sales of their goods and services.

16.   In many instances the telemarketing calls are initiated using a telemarketing service that delivers prerecorded voice messages, known as "voice broadcasting" or "robocalling." In other instances, the telemarketing calls are initiated by live representatives.

### A.   Defendants' Credit Card Interest Rate Reduction Campaign

17.   Defendants use the names "Clear Breeze Solutions," "MoneyWorks," and "Client Services," among others, when selling their purported credit card

6

interest rate reduction services to consumers.

18.   Defendants typically begin their relationship with consumers through a prerecorded message.  The message instructs consumers to "press 1 now" if they want to have their credit card interest rates lowered.  Consumers who press 1 are connected to a live telemarketer.  In other instances, consumers receive a solicitation from a live telemarketer similarly offering to lower consumers' credit card interest rates.

19.   Once connected to a telemarketer, Defendants promise consumers that they can substantially lower consumers' credit card interest rates and save them thousands of dollars in interest that consumers will otherwise have to pay.

20.   Defendants also represent to consumers that consumers will become debt-free much faster, typically three to five times faster, than they can without Defendants' program.  Defendants claim they can accomplish this without requiring consumers to make higher monthly payments than they are making currently.

21.   Defendants further guarantee that if consumers do not achieve a specific amount in savings, usually $4,000, Defendants will provide consumers with a full refund of their purchase price.

22.    The purchase price for Defendants' credit card interest rate reduction service is typically $990 to $1,495.

23.    Defendants tell consumers that the cost of Defendants' program will be paid for by the thousands of dollars the consumers will achieve in savings. In a script obtained from a former telemarketer, Defendants represent:

> There is **NO** out of pocket expense to you . . . . We make our money from the interest and finance charges we save you from the CC [credit card] companies.

24.    Consumers who pay Defendants' fee typically receive a packet of materials in the mail that reinforces the promises that Defendants make to consumers. In the materials, Defendants assure consumers that they will become debt-free three to five times faster than they would without Defendants' program. Defendants also repeatedly guarantee that consumers will receive a full refund of their purchase price if Defendants are unable to show consumers a minimum savings, like $4,000, through their program.

25.    Consumers who pay Defendants' fee do not receive what they are promised. In many instances, Defendants make no attempt to negotiate a lower interest rate with consumers' credit card companies. Even when Defendants do call consumers' credit card companies to request a lower interest rate, consumers' interest rates are rarely lowered and consumers do not save the thousands of dollars

8

in interest that Defendants promise. Consequently, consumers are not able to pay their credit card debts faster than without Defendants program.

26.     Further, Defendants refuse to give consumers a refund of their money as promised when they fail to show consumers their promised savings.

### B.     Warranty Scam

27.     Defendants use the names "Auto Protection Center" and "Warranty Services," among others, when selling purported automobile warranties to consumers.

28.     Defendants contact consumers with prerecorded messages that warn consumers that their automobile warranties are about to expire.

29.     Defendants have no information on which to base their claim that consumers' warranties are about to expire.

30.     Consumers are advised to "press 1" to speak to an operator in response to Defendants' message that their automobile warranties are about to expire. Consumers who press 1 are connected to a telemarketer who provides a generic name, like "Warranty Services." A script provided by a former employee states that Defendants then ask consumers to "verify" their information by providing the make and model of their vehicles and their telephone numbers. Consumers are then asked to wait for Defendants to "pull up [their] profile."

Telemarketers are then directed to obtain the consumers' names and addresses from the Internet White Pages directory. Consumers are then transferred by the telemarketer to a second telemarketer, called a "Warranty Specialist," and told to inquire with the "Warranty Specialist" about "Direct Dealer Pricing." A second script obtained from a former employee states that consumers are told they are "pre-qualified for direct dealer pricing." Consumers also are told:

> We are on direct pay with (name of manufacturer). That means you will be protected with nationwide coverage at any (name of manufacturer) dealership.

31.    Consumers are also told that Defendants work directly for the consumers' vehicle manufacturer.

32.    Defendants are not affiliated with consumers' automobile manufacturers or someone associated with them.

33.    Defendants instruct their employees to never disclose Defendants' real telephone number or address to consumers and to hang up the telephone if consumers ask too many questions.

**C.    Defendants' Illegal Dialing Practices**

34.    While telemarketing their programs, Defendants, acting directly or through one or more of their intermediaries, have made numerous calls to telephone numbers on the National Do Not Call Registry ("Registry"), as well as to

consumers who have previously asked Defendants not to call them again. In some

instances, Defendants or their telemarketers also "spoof" their calls by transmitting

phony Caller ID information so that call recipients do not know the source of the

calls.

35.     Since at least 2008, Defendants, acting directly or through one or

more of their intermediaries, have made numerous outbound telemarketing calls in

which they fail to connect the call to a sales representative within two (2) seconds

of the call recipient's completed greeting. Instead of connecting the call to a sales

representative, Defendants, acting directly or through one or more intermediaries,

have delivered a prerecorded voice message to the call recipient.

36.     In numerous instances, Defendants acting directly or through one or

more intermediaries, have initiated telemarketing calls that failed to disclose

truthfully, promptly, and in a clear and conspicuous manner to the person receiving

the call: the identity of the seller, that the purpose of the call is to sell goods or

services; or the nature of the goods or services. In numerous instances since

December 1, 2008, Defendants, acting directly or through one or more

intermediaries, have initiated prerecorded telemarketing calls to consumers that

failed to promptly make such disclosures.

37.     Since at least 2008, Defendants, acting directly or through one or
        more

intermediaries, have called telephone numbers in various area codes without first

paying the annual fee for access to the telephone numbers within area codes that

are included in the National Do Not Call Registry.

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

38.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or

deceptive acts or practices in or affecting commerce."

39.     Misrepresentations or deceptive omissions of material fact constitute

deceptive acts or practices prohibited by Section 5(a) of the FTC Act. 15 U.S.C. §

45(a).                              **COUNT I**

### Credit Card Interest Rate Reduction Misrepresentations
### in Violation of Section 5

40.     In numerous instances, in connection with the advertising, marketing,

promotion, offering for sale, or sale of Defendants' credit card interest rate

reduction program, Defendants have represented, directly or indirectly, expressly

or by implication, that:

A.     Defendants will substantially lower consumers' credit card interest

       rates in all or virtually all instances;

12

B.    Defendants will save consumers thousands of dollars in all or virtually all instances as a result of lowered credit card interest rates;

C.    Defendants will enable consumers to pay off their debts much faster, typically three to five times faster, in all or virtually all instances, as a result of lowered credit card interest rates; and

D.    Defendants will provide full refunds if consumers do not save thousands of dollars as a result of lowered credit card interest rates.

41.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 40 of this Complaint,

A.    Defendants did not substantially lower consumers' credit card interest rates;

B.    Defendants did not save consumers thousands of dollars in all or virtually all instances as a result of lowered credit card interest rates;

C.    Defendants did not enable consumers to pay off their debts much faster, typically three to five times faster, as a result of lowered credit card interest rates; and

D.    Defendants did not provide full refunds when consumers did not save thousands of dollars as a result of lowered credit card interest rates.

42    Therefore, Defendants' representations set forth in Paragraph 40 of this Complaint are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Automobile Warranty Misrepresentations in Violation of Section 5

43.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of automobile "warranties," Defendants have represented, directly or indirectly, expressly or by implication, that:

A.    Defendants are calling from, or affiliated with, the manufacturer or dealer of the consumer's automobile; and

B.    The consumer's automobile warranty is about to expire.

44.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 43 of this Complaint:

A.    Defendants were not calling from, or in any way affiliated with, the manufacturer or dealer of the consumer's automobile; and

B.    The consumer's automobile warranty was not about to expire.

45.    Therefore, Defendants' representations set forth in Paragraph 43 of this Complaint are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

46.    Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original Telemarketing Sales Rule in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

47.    Defendants are "seller[s]" or "telemaketer[s]" engaged in "telemarketing," and Defendants have initiated, or have caused telemarketers to initiate, "outbound telephone calls" to consumers, as those terms are defined in the TSR, 16 C.F.R. § 310.2(u), (z), (bb), and (cc).

48.    The TSR prohibits telemarketers and sellers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of the goods or services that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).

49.    The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies.  16 C.F.R. § 310.3(a)(2)(iv).

50.    The TSR prohibits sellers and telemarketers from misrepresenting,

directly or by implication, that they are affiliated with, or endorsed or sponsored by, any person or government entity.  16 C.F.R. § 310.3(a)(2)(vii).

51.    The TSR prohibits telemarketers and sellers from making any false or misleading statement to induce any person to pay for goods or services.  16 C.F.R.§ 310.3(a)(4).

52.    The TSR requires telemarketers in an outbound telephone call to disclose truthfully, promptly, and in a clear and conspicuous manner, the following information:

A.    The identity of the seller;

B.    That the purpose of the call is to sell goods or services; and

C.    The nature of the goods or services.

16 C.F.R. § 310.4(d)(1), (2), and (3).

53.    Since December 1, 2008, the TSR has prohibited a telemarketer from engaging, and a seller from causing a telemarketer to engage, in initiating an outbound telephone call that delivers a prerecorded message unless the message promptly discloses:

A.    The identity of the seller;

B.    That the purpose of the call is to sell goods or services; and

C.    The nature of the goods or services.

16 C.F.R. § 310.4(b)(1)(v)(B)(ii).

54.    The TSR also prohibits sellers and telemarketers from "abandoning" any outbound telephone call. 16 C.F.R. § 310.4(b)(1)(iv). An outbound telephone call is "abandoned" if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting. *Id.*

55.    In addition, the TSR, as amended in 2003, establishes a "do-not-call" registry (the "National Do Not Call Registry" or "Registry"), maintained by the FTC, of consumers who do not wish to receive certain types of telemarketing calls. Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at www.donotcall.gov.

56.    Since October 17, 2003, sellers and telemarketers have been prohibited from calling numbers on the Registry. 16 C.F.R.§ 310.4(b)(1)(iii)(B).

57.    Since January 29, 2004, sellers and telemarketers have been prohibited from failing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call. 16 C.F.R.§ 310.4(a)(7).

58.    Since October 17, 2003, sellers and telemarketers have been generally prohibited from calling any telephone number within a given area code unless the seller first has paid the annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry.  16 C.F.R.§ 310.8(a) and (b).

59.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c) and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### Credit Card Interest Rate Reduction Misrepresentations
### in Violation of the TSR

60.    In numerous instances, in the course of telemarketing Defendants' credit card interest rate reduction program, Defendants have misrepresented, directly or by implication, that:

A.    Defendants will substantially lower consumers' credit card interest rates in all or virtually all instances;

B.    Defendants will save consumers thousands of dollars in all or virtually all instances as a result of lowered credit card interest rates; and

C.     Defendants will enable consumers to pay off their debts much faster, typically three to five times faster, in all or virtually all instances, as a result of lowered credit card interest rates.

61.    Defendants' acts and practices, as described in Paragraph 60 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(iii).

## COUNT IV

### Refund Misrepresentations in Violation of the TSR

62.    In numerous instances, in the course of telemarketing Defendants' credit card interest rate reduction program, Defendants have misrepresented, directly or by implication, that Defendants will provide full refunds if consumers do not save thousands of dollars as a result of lowered credit card interest rates.

63.    Defendants' acts and practices, as described in Paragraph 62 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R.§§ 310.3(a)(2)(iv).

## COUNT V

### Automobile Warranty Misrepresentations in Violation of the TSR

64.    In numerous instances, in the course of telemarketing automobile "warranties," Defendants have misrepresented, expressly or by implication, that:

A.    Defendants were calling from, or affiliated with, the manufacturer or

dealer of the consumer's automobile; and

B.    The consumer's automobile warranty was about to expire.

65.    Defendants' act or practices, as described in Paragraph 64 above, are

deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R.§§

310.3(a)(2)(iii), 310.3(a)(2)(vii) and 310.3(a)(4).

## COUNT VI

### Violating the National Do Not Call Registry

66.    In numerous instances, in connection with telemarketing, Defendants

have engaged, or caused a telemarketer to engage, in initiating an outbound

telephone call to a person's telephone number on the National Do Not Call

Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

## COUNT VII

### Failing to Honor Do Not Call Requests

67.    In numerous instances, in connection with telemarketing, Defendants

have initiated or caused a telemarketer to initiate an outbound telephone call to a

person who previously has stated that he or she does not wish to receive an

outbound telephone call made by or on behalf of Defendants, in violation of the

TSR, 16 C.F.R. § 310.4(b)(1)(iii)(A).

## COUNT VIII

### Abandoning Calls

68.    In numerous instances, in connection with telemarketing, Defendants

have abandoned, or caused a telemarketer to abandon, an outbound telephone call

by failing to connect the call to a sales representative within two (2) seconds of the

completed greeting of the person answering the call, in violation of the TSR, 16

C.F.R. § 310.4(b)(1)(iv).

## COUNT IX

### Failing to Transmit Caller Identification

69.    In numerous instances, in connection with telemarketing, Defendants

have failed to transmit or have caused telemarketers to fail to transmit, the

telephone number and name of the telemarketer or of Defendants to any caller

identification service in use by a recipient of a telemarketing call, in violation of

the TSR, 16 C.F.R. § 310.4(a)(7).

## COUNT X

### Failing to Pay National Registry Fees

70.    In numerous instances, in connection with telemarketing, Defendants

have initiated, or caused a telemarketer to initiate, outbound telephone calls to a

telephone number within a given area code on behalf of a seller who has not, either

directly or through another person, paid the required annual fee for access to the

telephone numbers within that area code that are included in the National Do Not

Call Registry, in violation of the TSR, 16 C.F.R. § 310.8.

## COUNT XI

### Failing to Make Required Oral Disclosures

71.    In numerous instances, in the course of telemarketing goods and

services, Defendants have made or caused telemarketers to make outbound

telephone calls in which the telemarketer failed to disclose promptly and in a clear

and conspicuous manner to the person receiving the call:

A.    The identity of the seller;

B.    That the purpose of the call is to sell goods or services; or

C.    The nature of the goods or services.

72.    Defendants' practice as alleged in Paragraph 71 is an abusive

telemarketing practice that violates the TSR, 16 C.F.R. § 310.4(d).

## COUNT XII

### Initiating Unlawful Prerecorded Messages

73.    In numerous instances, on or after December 1, 2008, in the course of

telemarketing goods and services, Defendants have initiated, or caused a

telemarketer to initiate, outbound telephone calls delivering prerecorded messages

22

that, in violation of § 310.4(b)(1)(v)(B)(*ii*), do not promptly disclose the identity of the seller, that the purpose of the call is to sell goods or services, or the nature of the goods or services.

## CONSUMER INJURY

74.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

75.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

76.    Section 19 of the FTC Act, 15 U.S.C. § 57b and Section 6(b) of the Telemarketing Act, 15 U.S.C § 6105(b), authorize this Court to grant such relief as

the Court finds necessary to redress injury to consumers resulting from

Defendants' violations of the TSR, including the rescission or reformation of

contracts, and the refund of money.

## PRAYER FOR RELIEF

77.    Wherefore, Plaintiff Federal Trade Commission, pursuant to Sections

13(b) and 19 of the FTC Act, 15 U.S.C. § 53(b) and 57b, and Section 6(b) of the

Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers,

requests that the Court:

A.    Award Plaintiff such preliminary injunctive and ancillary relief as

may be necessary to avert the likelihood of consumer injury during

the pendency of this action and to preserve the possibility of effective

final relief, including but not limited to, temporary and preliminary

injunctions, an order freezing assets, immediate access, and

appointment of a receiver;

B.    Enter a permanent injunction to prevent future violations of the FTC

Act and the TSR by Defendants;

C.    Award such relief as the Court finds necessary to redress injury to

consumers resulting from Defendants' violations of the FTC Act and

the TSR, including but not limited to, rescission or reformation of

24

contracts, restitution, the refund of monies paid, and the disgorgement

of ill-gotten monies; and

D.    Award Plaintiff the costs of bringing this action, as well as such other

additional relief as the Court may determine to be just and proper.

Respectfully submitted,

WILLARD K. TOM
General Counsel

Dated: _____, 2009

Valerie M. Verduce
Attorney for Plaintiff
Federal Trade Commission
225 Peachtree Street, Suite 1500
Atlanta, Georgia  30303
Georgia Bar No. 727066
404-656-1355 telephone
404-656-1379 facsimile